UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPERATING ENGINEERS LOCAL UNION NO. 3,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 21-cv-02724-AGT<br><br>**ORDER GRANTING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 23 |

During the last two quarters of 2018 and the first quarter of 2019, Operating Engineers Local Union No. 3 ("OE3") failed to fulfill its federal tax obligations with respect to the funds it withheld from its employees' wages. By statute, these failures triggered the assessment of substantial penalties by the Internal Revenue Service ("IRS"), which OE3 paid in full. After unsuccessfully seeking reimbursement from the IRS, OE3 filed this suit seeking a refund of the penalties paid, plus interest, on the grounds that its failure to timely file, pay, and deposit payroll taxes during the periods at issue was "due to reasonable cause and not due to willful neglect." 26 U.S.C. §§ 6651(a), 6656(a). The Government now moves for summary judgment, arguing that OE3 lacked "reasonable cause" as a matter of law for its payroll tax delinquencies. The motion was argued and submitted on September 16, 2022. For the reasons explained below, the Government's motion is granted.

I.     **BACKGROUND**

    A.     **Statutory Framework**

Under the Internal Revenue Code, employers such as OE3 are required to deduct and withhold federal social security and income taxes from their employees' wages. 26 U.S.C. §§ 3102(a), 3402(a). These taxes must be held by the employer in a special trust fund for the benefit of the United States. 26 U.S.C. § 7501(a). The employer is liable for the payment of the

taxes required to be withheld and is required to report the amounts of withheld taxes on its quarterly payroll tax returns, Form 941. 26 U.S.C. §§ 3403, 6011(a); 26 C.F.R. §§ 31.6011(a)-1, 31.6011(a)-4(a)(1). These returns must be filed with the IRS on the last day of the month that follows the date that payroll taxes accrued in the preceding period. 26 C.F.R. § 31.6071(a)-1(a)(1). For example, for first quarter tax liabilities that accrued from January 1 to March 31, the payroll tax return for that quarter is due April 30. Payment of any tax liability is due the same day the return is due. 26 U.S.C. § 6151(a). In the interim, withheld taxes that are reported on Form 941 must be deposited either monthly or semi-weekly in an authorized government depository account. 26 U.S.C. § 6302; 26 C.F.R. § 31.6302-1.

The Internal Revenue Code calls for the assessment of mandatory penalties upon any taxpayer who fails to file a required return, 26 U.S.C. § 6651(a)(1), fails to pay the amount of tax due, 26 U.S.C. § 6651(a)(2), or fails to deposit the appropriate amount of tax in a government-authorized depository account, 26 U.S.C. § 6656(a). These statutory penalties are explicitly waived, however, if the taxpayer can show "such failure is due to reasonable cause and not due to willful neglect." *Id*.

### B.    Factual History

OE3 is the largest construction local union in the United States, representing over 37,000 members. Dkt. 1, Compl. ¶ 2. OE3 had a pristine record of over 100 years of federal tax law compliance, until the tax periods ending September 30, 2018 ("Q3 2018"), December 31, 2018 ("Q4 2018"), and March 31, 2019 ("Q1 2019"). Despite having sufficient funds to cover its tax liabilities during those three periods, OE3 failed to make timely payroll deposits. OE3 also failed timely to file its payroll tax return and pay its tax liability for Q3 2018. As a result of these failures, the IRS assessed statutory penalties against OE3 as follows:

| Tax Period | Internal Revenue Code § | Penalty Amount |
|---|---|---|
| Q3 2018 | 26 U.S.C. § 6651(a)(1) – Failure to file | $258,023.31 |
| Q3 2018 | 26 U.S.C. § 6651(a)(2) – Failure to pay | $19,372.43 |
| Q3 2018 | 26 U.S.C. § 6656 – Failure to deposit | $114,677.03 |
| Q4 2018 | 26 U.S.C. § 6656 – Failure to deposit | $107,914.99 |
| Q1 2019 | 26 U.S.C. § 6656 – Failure to deposit | $87,309.40 |
| | Total: | $587,297.16 |

*See* Dkt. 23-2. OE3 paid the penalties plus accrued interest, then sought a refund from the IRS on the ground that it had "reasonable cause" for its failure to timely file, pay, and deposit payroll taxes. Specifically, OE3 claimed that it was "completely disabled and incapacitated with regard to its tax obligations" due to the "mental disability" of the employee who was responsible for its payroll tax duties, Angela Rose. *See* Compl. Exs. A, B, D, E, F (Claims for Refund and Requests for Abatement). The IRS denied OE3's claims for refund, explaining that "the fact that your employee handled all of your tax matters isn't a mitigating circumstance. You are responsible for making a timely deposit and someone else's failure can't be a basis for removing your penalty." *Id.* Ex. C at 18–19.

OE3 subsequently filed this action to compel a refund of the $587,297.16 in penalties it paid to the IRS, plus statutory interest. OE3's complaint asserts a single claim, based on the same allegations asserted in its claims for refund filed with the IRS: "The failure of [OE3] to timely file and pay payroll taxes and make proper tax deposits due for the tax periods ending September 30, 2018; December 31, 2018; and March 31, 2019 was not due to willful neglect but due to reasonable cause." *Id.* ¶ 22. According to OE3, the "events which ultimately led to [its] failure to comply with its tax payment and reporting obligations stem from the [June 2018] resignation of then Accounting Manager Lilian Morata and actions by then Finance Director/Controller [Angela Rose]." *Id*. Ex. A at 7.

At all relevant times, OE3 was governed by an executive board comprised of six officers: the Business Manager, Russell Burns, who was "basically the CEO of the union" and oversaw OE3's entire operation, and the President, Vice President, Treasurer, Financial Secretary, and Recording Corresponding Secretary, who all reported to Burns. *See* Dkt. 23-3, Burns Dep. at 12:6–13:25; Dkt. 23-4, Reding Dep. at 10:6–7. As Business Manager, Burns had final say on all union matters and the right to hire and fire everybody on OE3's staff. *See* Reding Dep. at 10:6–11. Burns also had supervisory control over OE3's accounting department, which was responsible for OE3's payroll tax obligations, and he was the direct supervisor of both the Finance Director/Controller and the Accounting Manager. Burns Dep. at 14:1–6. The Accounting Manager, with oversight from the Finance Director/Controller, had the immediate responsibility

3

for ensuring that OE3's payroll taxes were filed, deposited, and paid on time. Dkt. 23-5, Rose Dep. at 27:15–28:1.

OE3 initially hired Angela Rose in 2007 for the position of Accounting Manager. Rose had previously worked as an auditor at Miller, Kaplan, Arase LLP ("Miller Kaplan"), the accounting firm that conducted annual audits of OE3's finances as required by the Department of Labor. As Accounting Manager, Rose was in charge of OE3's payroll tax obligations: she prepared and filed the quarterly payroll tax returns, paid the payroll taxes, and made the payroll tax deposits. Rose utilized OE3's "Sage" accounting software program to schedule and pay OE3's payroll taxes. *See* Dkt. 23-6 at 4–5. The Sage program would generate payroll tax reports, and Rose would then manually log in to the IRS's electronic tax payment system website to make electronic tax payments. *Id.* at 5. OE3's payroll taxes were paid weekly. *Id.* Rose also prepared OE3's payroll tax returns using the Sage payroll reports. At the end of each quarter, Rose would go to the IRS's website, pull up Form 941, type in the required information, print the completed return, sign it, and then mail it to the IRS. Rose Dep. at 50:11–22. Rose typically kept copies of the signed and dated returns in her files at OE3. *See id.* at 111:7–112:23.

In May 2015, Rose was promoted to Finance Director/Controller and Lillian Morata was hired to fill the Accounting Manager position. For the next three years, Morata, with oversight from Rose, handled OE3's payroll tax duties. *See id.* at 48:6–24; Dkt. 23-6 at 4. Morata also assisted Rose with preparing OE3's monthly "Treasurer's Report," which provided an overview of OE3's financial activity and payroll tax liabilities. *See* Burns Dep. at 61:4–62:18; Rose Dep. at 19:16–19. It was Rose's responsibility as Finance Director/Controller to present the Treasurer's Report to OE3's officers for review during their monthly board meetings. *See* Rose. Dep. at 17:16–24, 19:11–25; Dkt. 23-9 at 3. Rose was also responsible for submitting bills to OE3's officers for review and sign-off. Burns Dep. at 25:21–26:2. Rose did not have signature authority on OE3's bank accounts; only OE3's officers were authorized to sign checks and bills on behalf of OE3. *See* Dkt. 23-6 at 4; Reding Dep. at 11:9–10.

In June 2018, Morata resigned from OE3. Dkt. 23-6 at 5. OE3 maintains that upon Morata's resignation, Rose recommended to OE3's officers that the Accounting Manager position

4

not be immediately filled, and proposed instead that she absorb Morata's responsibilities, including filing and payment of payroll taxes. *Id.* According to OE3, because of Rose's "lengthy tenure, her trusted senior leadership position as the head of the Accounting and Finance Department, and the fact that she previously worked as the Accounting Manager and was familiar with the responsibilities of that role, OE3's officers trusted her and agreed to her recommendation." *Id.* According to Rose, however, she made no such recommendation. Rose Dep. at 21:10–24. On the contrary, Rose testified that she told OE3's Human Resources director that the vacant Accounting Manager position needed to be filled as soon as possible. *Id.* at 21:25–22:5. Nevertheless, for the next eleven months, Rose took on both roles.

In the six months following Morata's June 2018 resignation, there was some confusion in the accounting department as to who was trained and responsible for OE3's payroll taxes, although Rose acknowledged that "ultimately [she was] the director." *Id.* at 26:4–27:21. Shortly before Morata's departure, Rose had asked her to train another employee in the accounting department, Ellen Sanchez-Simmons, on how to do OE3's payroll taxes, but that training was not completed. *Id.* at 26:12–21. Rose, unaware that Sanchez-Simmons had not received payroll training, assumed that Sanchez-Simmons was handling OE3's payroll payments and deposits. *Id.* at 63:9–11. Sanchez-Simmons, however, was "not familiar with payroll" and believed that Rose had taken over OE3's payroll tax duties after Morata left. Dkt. 23-7, Sanchez-Simmons Dep. at 23:22–24:13. As it turns out, no one was paying or depositing OE3's payroll taxes during the second half of 2018.

According to Rose, she first discovered these payroll tax delinquencies during the last week of December 2018. Rose Dep. at 38:20–22. Rose realized that she "had made a huge error in not recognizing the payroll taxes had not been scheduled," and "immediately started gathering up all the necessary info so [she] could start scheduling the payments." Dkt. 23-8 at 1. Rose made the outstanding payments on December 31, 2018. Dkt. 23-6 at 5. Rose admittedly did not tell anyone at OE3 about the late payments until several weeks later, when Miller Kaplan auditors discovered the issue during their annual audit of OE3's finances and confronted her about it. *Id.* at 5–6. When asked why the payroll taxes had not been timely paid in 2018, Rose responded that

5

she "was so busy doing everything else it just was one of those things that slipped through the cracks." Rose. Dep. at 39:19–22.  Rose also testified that she did not immediately report the late payments to OE3's officers because they were not in the office and she was "so swamped" and "just doing the best [she] could to get all the work done that [she] needed to get done." *See id.* at 114:24–116:11.

In March 2019, Miller Kaplan's head auditor, Mike Quackenbush, notified OE3's officers that upon reviewing the organization's financials, he discovered that OE3 had made "substantial payroll tax payments" to the IRS and California tax authorities on December 31, 2018.  Dkt. 23-6 at 5.  Miller Kaplan commenced an investigation into the matter, which exposed that OE3's payroll taxes remained unpaid from July 2018 through December 30, 2018.  *Id.*  It was further discovered that in Q1 2019, some payroll taxes were paid while other weeks remained unpaid.  *Id.*

According to OE3, in April 2019, during its investigation of these payroll tax delinquencies, Rose revealed that "she had been having a psychological breakdown since the Fall of 2018, which was "compounded by personal crises including her entire family losing their homes in the Paradise fires."[1]  *See id.* at 7; Compl. Ex. A at 2.  OE3's officers were not previously aware of Rose's personal struggles and "there was no indication from anyone that [Rose] was not completing her work, or that she was not making payroll tax payments or filing the required tax reports" during the periods in question.  *Id.*  Indeed, during that time, OE3's officers and board had relied solely on Rose to present an accurate picture of OE3's financial situation via the Treasurer's Report.  *See* Reding Dep. at 31:16–19; Burns Dep. at 62:8–12, 64:6–9.

In mid-March 2019, Miller Kaplan provided OE3 with a report summarizing the findings of its audit of OE3's financials for the 2018 calendar year.  *See* Dkt. 23-9.  The 2018 audit report considered OE3's "internal control over financial reporting" and found several "significant deficiencies," which it defined as deficiencies "important enough to merit attention by those charged with governance."  *Id.* at 1.  One of the identified deficiencies concerned OE3's

---

[1] Rose disagrees with OE3's characterization of her mental state, testifying that she did not "feel like it was a psychological breakdown.  I was just extremely stressed trying to handle it all, and there was no support from anybody.  Just hire somebody.  Can't do that if your HR director doesn't help you."  Rose Dep. at 42:7–11.

6

Treasurer's Report, which Miller Kaplan noted "did not reflect the actual financial status of the Union," as it "did not include the actual payroll tax liability amounts in the months of November and December 2018." *Id.* at 3. Miller Kaplan also noted its concern that "the financial statements and reports included in the Treasurer's Report are not directly sourced from the [Sage] accounting software but instead are prepared by [Rose] in Excel," which "could lead to manipulation in presentation of the accurate financial status of OE3 to the Board." *Id.*; Dkt. 23-10 at 2. Another identified deficiency concerned OE3's bank reconciliation process, in which OE3's "Director of Finance reviews the bank statements and the Accounting Manager prepares the bank reconciliations." Dkt. 23-9 at 3. Miller Kaplan "noted that a secondary review of the bank reconciliation is not being performed," and recommended that "an Officer of [OE3] perform a monthly review of the bank reconciliations and document their review and approval on the bank reconciliation." *Id.*

In late April 2019, two IRS officers made an unannounced visit to OE3's offices and met with Rose and OE3's in-house counsel, Gening Liao. *See* Rose Dep. at 109:8–112:24. During that visit, the IRS officers informed Rose and Liao that the IRS had no record of receiving OE3's Form 941 tax returns for Q3 2018 and Q4 2018. *Id.* Rose told the IRS officers that she believed both returns had been timely mailed to the IRS, but she could not find her copies of the mailed returns when the officers asked for them. *See id.* at 112:7–8. So instead, at the IRS officers' request, Rose reprinted the Form 941s for both quarters, signed and dated them, and handed them to the IRS officers on the spot. *Id.* at 109:8–22, 112:4–25.

In May 2019, Rose resigned from OE3. Around the same time, OE3 also began implementing a series of reforms to ensure that its payroll tax failures would not recur, including: (1) hiring a third-party payroll system vendor to handle these tax payments; (2) hiring a Chief Financial Officer over the Finance Director/Controller to oversee the finance department and supervise its work; and (3) filling the Accounting Manager position left vacant by Morata. *See* Dkt. 23-6 at 5.

\\

\\

## II. LEGAL STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "genuine" dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Material" facts are those "that might affect the outcome of the suit under the governing law," as opposed to "disputes that are irrelevant or unnecessary." *Id.*

To determine whether a genuine dispute as to any material fact exists, the evidence is viewed in the light most favorable to the nonmoving party, and "all justifiable inferences are to be drawn" in that party's favor. *Id.* at 255. The moving party may initially establish the absence of a genuine issue of material fact by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.* at 323–24. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins.

## III. DISCUSSION

The Government moves for summary judgment on the ground that OE3 lacked reasonable cause, as a matter of law, for its admitted failure to timely file, pay, and deposit payroll taxes during the periods in question. In opposition, OE3 argues that the reasonable cause determination is "rife with factual issues" and cannot be resolved on summary judgment. Dkt. 24 at 4. OE3 also argues, apart from reasonable cause, that there are two additional factual disputes concerning the Q3 2018 penalties: whether OE3's Q3 2018 tax return was actually timely filed with the IRS; and

whether the IRS followed its own Internal Revenue Manual and considered an administrative waiver of the Q3 2018 penalties. According to OE3, these additional factual disputes preclude summary judgment at least as to its Q3 2018 refund claims. The Court addresses each argument in turn and, as discussed below, finds no genuine disputes of material fact present on this record. The Government's motion for summary judgment is therefore granted.

### A. "Reasonable Cause" Exception to Tax Penalties

Under 26 U.S.C. §§ 6651(a) and 6656(a), a taxpayer failing to timely file, pay, and deposit payroll taxes shall be assessed a penalty, "unless it is shown that such failure[s] [are] due to reasonable cause and not due to willful neglect." Thus, "[t]o escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause.'"[2] *United States v. Boyle*, 469 U.S. 241, 245 (1985). Though "reasonable cause" is not defined by the Internal Revenue Code, "the relevant Treasury Regulation calls on the taxpayer to demonstrate that he exercised 'ordinary business care and prudence' but nevertheless was 'unable to file the return within the prescribed time.'" *Id.* at 246 (quoting 26 C.F.R. § 301.6651-1(c)(1)). Similarly, to establish reasonable cause for failure to pay, the taxpayer must show "that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless . . . unable to pay the tax . . . ." 26 C.F.R. § 301.6651-1(c)(1). "Whether the elements that constitute 'reasonable cause' are present in a given situation is a question of fact, but what elements must be present to constitute 'reasonable cause' is a question of law." *Boyle*, 469 U.S. at 249 n.8 (emphasis omitted).

In *Boyle*, the Supreme Court laid down a bright-line rule regarding the reasonable cause standard: reliance on an agent to file a timely tax return when the due date of return was ascertainable by the taxpayer does not constitute reasonable cause excusing the taxpayer from statutory penalties for late filing. *Id.* at 252; *see also Conklin Bros. of Santa Rosa v. United States*, 986 F.2d 315, 317 (9th Cir. 1993). The Court, recognizing the importance of deadlines to the administration of the tax system, made clear that "Congress has placed the burden of prompt filing

---

[2] The Government does not contend that OE3's payroll tax failures were due to willful neglect. *See* Dkt. 23 at 13–14 n.1.

9

on the [taxpayer], not on some agent or employee of the [taxpayer]." *Boyle*, 469 U.S. at 250. That duty, the Court held, is "fixed and clear" and simply because the agent was capable and "expected to attend to the matter does not relieve the [taxpayer] of [its] duty to comply with the statute[s]." *Id.* at 249–50. However, the Court also "expressly distinguished the question of the taxpayer's misplaced reliance on an agent to perform a known duty from the question of the taxpayer's disability." *Conklin*, 986 F.2d at 318 (citation omitted). That is, the *Boyle* Court noted:

> The administrative regulations and practices exempt late filings from the penalty when the tardiness results from postal delays, illness, and other factors largely beyond the taxpayer's control. . . . This principle might well cover a filing default by a taxpayer who relied on an attorney or accountant because the taxpayer was, for some reason, incapable by objective standards of meeting the criteria of "ordinary business care and prudence." In that situation, however, the disability alone could well be an acceptable excuse for a late filing.
>
> But this case does not involve the effect of a taxpayer's *disability*; it involves the effect of a taxpayer's *reliance* on an agent employed by the taxpayer, and our holding necessarily is limited to that issue rather than the wide range of issues that might arise in future cases under the statute and regulations.

*Boyle*, 469 U.S. at 249 n.6.

Here, OE3 argues that it exercised ordinary business care through its bank reconciliation process and "because it had oversight from senior leaders and the board of directors on financial matters and bills being paid by reviewing OE3's Treasury Reports" each month. Dkt. 24 at 10. OE3 emphasizes that these "ordinary business care procedures" were always sufficient to ensure timely compliance with its payroll tax obligations and indeed, prior to Q3 2018, OE3 had never missed a filing, deposit, or payment deadline. *Id.* But OE3 argues that during the tax periods in question, it was "disabled" from exercising ordinary business care because Angela Rose—who was in charge of OE3's payroll tax duties and monthly Treasurer's Reports, and upon whom OE3's officers were solely relying for an accurate picture of OE3's financials—omitted OE3's payroll tax liabilities from the Treasurer's Reports she presented to OE3's officers and board. *Id.* at 12. OE3 further contends that it "never had a reason to believe Angela Rose was not performing her job duties effectively regarding the [payroll] taxes because she was an expert high ranking official with the union, and her job performance had been good up until that point." *Id.* at

10

11. According to OE3, its payroll tax failures resulted from "circumstances beyond OE3's control" because:

> OE3 could not control Rose's intentional act of omitting the payroll tax deposits from the financial reports. Rose had full control over the financial reporting to the CEO and the Board. The CEO and the Board did not have control over the financial reporting matters as the Government suggests. They were often out of the office and districts for meetings. Thus, OE3 was rendered objectively incapable of meeting its [payroll tax] obligations because the agent in control of financial reporting caused OE3's disability.

*Id.* at 12 (citing *Boyle*, 469 U.S. at 248–49). The Government, however, argues that the undisputed facts establish that "OE3, as an entity, had the capability to timely file and pay its taxes, which precludes a finding of reasonable cause under controlling law." Dkt. 25 at 3 (citing *Conklin*, 986 F.2d at 318). The Court agrees.

In *Conklin*, a case factually analogous to the instant action, the Ninth Circuit found no reason to excuse the corporate taxpayer (Conklin Brothers) from liability for penalties for late filings, payments, and deposits. 986 F.2d at 318–19. Conklin Brothers had promoted Diana Stornetta, an accounts payable clerk, to the position of office manager/controller and entrusted her with responsibility for its payroll tax filing and payment obligations. Although Stornetta performed well in her new position such that "close supervision and review of [her] payroll tax related duties were no longer necessary," she still reported to the company president and met with its outside accountants each month and at the end of the year. *Id.* at 315–16. Nevertheless, Stornetta was able to hide for over two years her failure to file payroll tax returns and make appropriate payments to the IRS. Stornetta's concealment involved intercepting and screening the mail for IRS penalty notices, altering check descriptions and quarterly reports, and undertaking the performance herself of all payroll functions. *Id.* at 316. Even though this wrongdoing was all Stornetta's, the Ninth Circuit noted that she had only limited power in conducting her duties; for instance, to issue a company check, Stornetta either had to have it signed by Conklin Brothers' president or sign it herself with a countersignature from the company's corporate secretary. *Id.*

Conklin Brothers, the taxpayer, only became aware of the payroll tax delinquencies after Stornetta's abrupt resignation. *Id.* After paying the penalty assessments, Conklin Brothers filed

11

suit seeking a refund on the basis that "Stornetta's intentional misconduct disabled it from adhering timely to its tax obligation." *Id.* at 318. The Ninth Circuit rejected this argument, reemphasizing the lesson of *Boyle* that, because corporations act only through their agents and employees, they "cannot *rely* upon those agents or employees, acting within the scope of authority, to escape responsibility for the nonperformance of nondelegable tax duties." *Id.* Rather, a corporate taxpayer must establish that "it was *disabled* from complying timely" due to actions or events "beyond the corporation's control." *Id.* Conklin Brothers could not make such a showing, the Ninth Circuit held, because "Stornetta's deficient and improper conduct was not largely beyond Conklin's control." *Id.*

Applying *Conklin* to this case, it is clear as a matter of law that OE3 has not established reasonable cause to avoid the late penalty fees. The undisputed facts show that OE3 relied solely on Rose, acting within the scope of her authority, to ensure that it met its payroll tax obligations during the periods in question. But OE3 "cannot avoid responsibility by simply relying on its agent to comply with the [tax] statutes." *Id.* at 317. The undisputed facts also show that, as in *Conklin*, the circumstances resulting in OE3's payroll tax delinquencies were not beyond OE3's control. Rose was not an officer of OE3, or a member of its board, and she was at all times subject to the direct supervision of OE3's Business Manager, Russell Burns, who could have seen to it that OE3 timely fulfilled its tax obligations.

OE3 does not discuss *Conklin* in its briefing. Instead, OE3 relies on *In the Matter of American Biomaterials Corp.*, 954 F.2d 919 (3d Cir. 1992), to support its contention that Rose's actions disabled it from complying timely with its tax duties. In *Biomaterials*, two corporate officers were discovered defrauding their corporation, failing to file and pay its taxes, and embezzling corporate funds. *Id.* at 920–21. These officers were the CEO and Chairman of the Board and the CFO and Treasurer of the corporation—"the only officers . . . with the responsibility to file tax returns and ensure payment." *Id.* at 922. Because the embezzlement of the sole people in charge "incapacitated the corporation" and rendered Biomaterials unable to comply with the tax laws, the Third Circuit held that Biomaterials' failure to timely file, deposit, and pay its payroll taxes was excused for reasonable cause. *Id.* at 921, 928. But that case is

12

materially distinguishable from the facts here for the same reasons articulated by the Ninth Circuit in *Conklin*:

> In *Biomaterials*, the criminal conduct committed by corporate officers and the Chairman of the Board of Directors was beyond the corporation's control because they were the control people in the corporate structure. *Supervision over such control people was not possible.* In this instance, Conklin had control over Stornetta. She was a manager/controller whose actions were subject to being supervised by Bowers, Conklin's president and majority shareholder, and by Conklin's outside accountants . . . . Thus, . . . under the circumstances Conklin was not disabled in complying timely with its tax obligations.

*Conklin*, 986 F.2d at 318 (emphasis added). The decision in *Conklin* mandates a similar conclusion here.

Because OE3 "was not disabled and cannot rely on its employee or agent to escape responsibility for the nonperformance of nondelegable tax duties, there are no disputed issues of material fact whether [OE3] had reasonable cause to avoid the late penalty fees under I.R.C. §§ 6651(a) and 6656(a)." *Id.* at 319.

### B. Timeliness of OE3's Q3 2018 Tax Return Filing

The most significant penalty in this case ($258,023.31, plus interest) arises from OE3's late filing of its Q3 2018 payroll tax return, which was due on October 31, 2018, but was not filed with the IRS until April 2019. *See* Dkt. 23-2 at 2. Despite acknowledging its "failure [] to timely file" this return in its claims for refund and complaint, *see* Compl. ¶ 22 & Ex. A at 9–10, OE3 now contends that there is a factual dispute as to whether the return was actually timely filed which precludes summary judgment at least as to the Q3 2018 late filing penalty. To support its claim of timely filing, OE3 relies on Rose's deposition testimony regarding her belief that she mailed the Q3 2018 return to the IRS on time, in "like the first week of October [2018]." Rose Dep. at 109:8–17; *see id.* at 40:16–18, 50:1–51:8, 110:4–6, 116:23–117:4. OE3 argues that "Rose's testimony is to be believed for purposes of ruling on a summary judgment motion, which creates a material factual dispute on this significant [Q3 2018 late filing] penalty, which must be resolved by a jury." Dkt. 24 at 8. This argument, which relies on the common-law mailbox rule, is also

foreclosed by controlling authority.[3]

As an initial matter, the Government has met its evidentiary burden with respect to the untimeliness of OE3's Q3 2018 tax return filing. The Government has produced Certificates of Assessments and Payments on Form 4340, which reflect that OE3's Q3 2018 return was filed six months late, on April 25, 2019, and that OE3 was assessed a penalty of $258,023.31 for that late filing. *See* Dkt. 23-2 at 2–3. "It is settled in this circuit that Certificates of Assessments and Payments are 'probative evidence in and of themselves and, in the absence of contrary evidence, are sufficient to establish that . . . assessments were properly made.'" *Koff v. United States*, 3 F.3d 1297, 1298 (9th Cir. 1993) (citation omitted); *see also Hazel v. Comm'r*, 95 T.C.M. (CCH) 1528 (2008) (reiterating that Forms 4340 can provide the basis for finding that a taxpayer did not file a timely return and collecting cases holding same). OE3 does not dispute that the Q3 2018 return Rose claims to have mailed in early October 2018 was never received by the IRS. Instead, OE3 contends that Rose's testimony of timely mailing raises a triable issue as to timely filing. It does not.

The law in the Ninth Circuit has changed with respect to how a taxpayer can prove timely filing of an undelivered tax document with the IRS. Previously, under the common-law mailbox rule, a taxpayer could prove timely filing by testimonial or circumstantial evidence. *See Anderson v. United States*, 966 F.2d 487, 491–92 (9th Cir. 1992). But a 2011 Treasury Regulation supplanted that rule and expressly limited the types of evidence that can prove timely filing:

> Other than direct proof of actual delivery, proof of proper use of registered or certified mail, and proof of proper use of a duly designated [private delivery service], are *the exclusive means* to establish prima facie evidence of delivery of a document to the agency, officer, or office with which the document is required to be filed. *No other evidence of a postmark or of mailing will be prima facie evidence of delivery or raise a presumption that the document was delivered.*

26 C.F.R. § 301.7502-1(e)(2)(i) (emphases added). As the Ninth Circuit held in *Baldwin*, the

---

[3] Under the common-law mailbox rule, "proof of proper mailing—including by testimonial or circumstantial evidence—gives rise to a rebuttable presumption that the document was physically delivered to the addressee in the time such a mailing would ordinarily take to arrive." *Baldwin v. United States*, 921 F.3d 836, 840 (9th Cir. 2019).

regulation is valid and it "makes clear that, unless a taxpayer has direct proof that a document was actually delivered to the IRS, IRC § 7502 provides the exclusive means to prove delivery. In other words, recourse to the common-law mailbox rule is no longer available." 921 F.3d at 841–43.

Here, OE3 offers no admissible evidence to prove timely filing of its Q3 2018 return. As noted, Treasury Regulation § 301.7502-1(e)(2) bars consideration of OE3's testimonial evidence of timely mailing.[4] And there is no direct evidence of actual delivery to the IRS, and no proof of proper use of registered or certified mail, despite Rose's acknowledgement that if she indeed mailed the return there should be such proof in OE3's files. *See* Rose Dep. at 109:8–112:11. The Court therefore finds that OE3 has failed to raise a genuine issue of material fact as to the timeliness of its Q3 2018 return. *See In re 1918 Dracena Dr., Los Angeles, CA 90027-3107 v. NBS Default Servs., LLC*, 2019 WL 6170725, at *6 (C.D. Cal. Nov. 19, 2019) (applying *Baldwin* and concluding that "because Platinum did not provide the certified mail sender's receipt in question, Platinum failed to raise a triable issue of fact as to whether it properly sent a copy of the 2013 Notice to the IRS").

### C. Reliance on the IRS's Internal Revenue Manual

Finally, to defeat summary judgment, OE3 contends that the Q3 2018 penalty assessments should have qualified for an administrative waiver under the IRS's "First Time Abatement" policy described in Internal Revenue Manual 20.1.1.3.3.2.1. OE3, therefore, argues that a factual issue exists as to "whether the IRS considered a 'first time abatement penalty waiver' pursuant to its own internal procedures," which precludes summary judgment at least as to the Q3 2018 penalties. Dkt. 24 at 4. This argument is without merit. The First Time Abatement procedures set forth in the Internal Revenue Manual "are a form of administrative, not judicial, relief." *Laidlaw v.*

---

[4] OE3 also submitted a declaration from Liao (OE3's in-house counsel), along with a memorandum regarding "Payroll Tax Filings" from Liao to OE3's Treasurer, dated May 8, 2019, describing the April 25, 2019, unannounced visit by two IRS officers to OE3's offices. *See* Dkt. 27 at 3–4, 6. Liao's memo states that during the April 2019 meeting, the IRS officers "indicated that the IRS did not have any record of [OE3's] Form 941 filings for the 2nd through 4th Quarters of 2018, despite Ms. Rose's efforts to file the returns by mail." *Id.* at 6. OE3 asserts that this evidence is "not being offered to prove that the [2018] returns were in fact filed, or lost by the IRS," but rather to show that "the IRS was made aware of [OE3's] claim that the [Q3 2018] return was timely filed." Dkt. 30 at 4. Even if this evidence was being offered to prove timely filing, it would be barred by Treasury Regulation § 301.7502-1(e)(2).

*Comm'r of Internal Revenue*, 114 T.C.M. (CCH) 243 (2017).  Moreover, it is well settled that the Internal Revenue Manual only governs the internal affairs of the IRS; it "does not have the force of law and does not confer rights on taxpayers." *Fargo v. Comm'r*, 447 F.3d 706, 713 (9th Cir. 2006).

## IV. CONCLUSION

For the reasons stated above, the Government's motion for summary judgment is granted.

**IT IS SO ORDERED.**

Dated: February 10, 2023

_____
ALEX G. TSE
United States Magistrate Judge

16